## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN F. STREMPLE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 01-890 |
| | ) | |
| v. | ) | Magistrate Judge Caiazza |
| | ) | |
| R. JAMES NICHOLSON, | ) | |
| SECRETARY OF THE DEPARTMENT | ) | |
| OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having conducted a bench trial in the above-captioned case, the court now enters these findings of fact and conclusions of law.

The court will utilize the narrative voice, rather than numbered findings and conclusions. Where any doubt may arise, the undersigned will specify whether the determination is made by the court sitting as finder of fact or as a matter of law.

The trial transcript in this case has been filed, on a daily basis, under separate docket numbers. In citing the transcript, the court will refer to the docket number corresponding to the date of the transcript, then a period (".") symbol, followed by the specific page number(s). After each entry, in parentheses, will appear the identity of the witness. Thus, the testimony of Carolyn E. Bechtold, appearing on the hundredth page of the transcript dated September 6, 2005 (Doc. 89), will be cited "Tr. at 89.100 (Bechtold)."

The long and detailed factual background in this case is intimately familiar to the parties, and the court therefore will restrict its discussions to those facts most germane to its conclusions.

I.      **The Plaintiff**

John F. Stremple, M.D. ("the Plaintiff" or "Dr. Stremple") is an Army veteran who has

provided this country and its former military personnel a long and distinguished period of

service.  When the Plaintiff first became Chief of Surgery at the VA Healthcare System in

Pittsburgh, Pennsylvania ("the VA" or "the Pittsburgh VA") in 1978, he was the only attending

surgeon.  *See* Tr. at 91.51, 91.55 (Stremple).  From that point forward, he remained the driving

force behind the hospital's surgical services and a tireless advocate of veteran-patient rights.  *See*

*generally* Tr. at 88.33 (Eilbing) (agreeing that Plaintiff ran surgical services for twenty-five years

before being supplanted in 1997); Tr. at 89.50 (Bechtold) ("Dr. Stremple . . . was always

passionate about veterans.  He cared very much for [them]."); Tr. at 90.98 (McDonald) ("He was

an advocate for excellent patient care, period.").

During his career at the Pittsburgh VA, Dr. Stremple developed an excellent reputation

among his peers, and he earned the deep admiration of locally and nationally renowned medical

professionals.  *See, e.g.*, Tr. at 90.18 (Starzl) (Plaintiff had "a great reputation[;] I wish I could

come up to it"); Tr. at 90.55 (McDonald) ("[T]he reason I picked him to be on my advisory

committee was because he was one of the top surgeons in the system. . . .  He was well-known.

And as I worked with him over the years, he was outstanding."); Tr. at 90.91 (Atwell) ("[H]is

reputation is flawless.  Dr. Stremple is a very well-respected surgeon.  He served with distinction

as a surgeon in Vietnam[ and as a] professor of surgery at the University of Pittsburgh.  He's a

member of the most prestigious surgical society in the United States, the American Surgical

Association.").  He also was instrumental in the development of groundbreaking programs, ones

otherwise not likely to have been made available to his veteran patients.  *See, e.g.*, Tr. at 90.8-9

-2-

(Starzl) ("John Stremple was the person that initiated the plan to get [the liver transplant program] put together [in Pittsburgh]," he "was the gadfly who was getting on the plane and flying to Washington and hassling them, . . . pointing out the need, and complaining that the veterans were not being given . . . fair [consideration]"); Tr. at 90.38-39 (McDonald) (Plaintiff was one of four "founding members" of NSQIP, "[a] program . . . so successful that the American College of Surgeons has adopted [it]").

In all, the fact finder concludes Dr. Stremple was a rare and valuable servant of the veterans, the VA, and his country.

## II.    <u>The Plaintiff's Non-Selection As Vice President of the Surgical Services Line</u>[1]

In October 1996, various VA operations were merged to form a single Veterans' Administration Pittsburgh Healthcare System.  This integrated entity included the operations of three facilities:  (1) the University Drive campus, which served acute care patients ("University Drive" or "Oakland"); (2) the Aspinwall campus, which served intermediate and nursing home patients ("Aspinwall"); and (3) the Highland Drive campus, which served psychiatric care patients ("Highland Drive").  *See generally* Tr. at 92.7-9 (Cappello).  The newly integrated system resulted in an overlap of multiple services and service chiefs.  These positions subsequently were reduced from over 50 services to approximately 26.  *See generally id.* at 92.9.

---

[1]  In a previous ruling, the court determined that the Plaintiff's non-selection claim was barred by his failure to exhaust administrative remedies.  *See generally* R&R (Doc. 30) at 13 (adopted by Mem. Order dated Jul. 7, 2003).  Nevertheless, the Plaintiff's evidence regarding non-selection was admitted at trial as background information for his claims of hostile work environment, retaliation, and constructive discharge.  *See* Order dated Aug. 24, 2005 (Doc. 74).

In addition to, but separate from, the integration of the three campuses, the existing services were consolidated into service lines.  Twelve new managerial positions were created to run the lines.  *See id.* at 92.15-16.

In April 1997, the Plaintiff applied for the Product Line Manager position for the Surgical Specialty Care Service Line (later referred to as Vice President of the Line, hereinafter "VP"), and he was one of three applicants deemed qualified.  Another candidate was Carolyn E. Bechtold ("Nurse Bechtold"), then an Associate Chief Nurse of the Nursing Service.  Nurse Bechtold was ranked first by a three-member interviewing committee, and she ultimately was selected for the position by Thomas Cappello, the Medical Center Director ("Mr. Cappello"), in May 1997.  *See id.* at 92.21-22.

Nurse Bechtold was selected over Dr. Stremple based on the reviewers' belief that she possessed stronger administrative and managerial skills.  *See, e.g.*, Tr. at 92.22 (Cappello); Tr. at 96.154 (Lowe); *see also id.* at 96.169 ("We weren't looking for a surgeon.  We were looking for a manager.").  Ernest Urban, M.D. ("Dr. Urban") , the interim chief of staff and the Plaintiff's direct supervisor,[2] suggested Nurse Bechtold and Dr. Stremple were expected to share a partnership, with the Nurse assisting the Doctor regarding administrative matters so he could focus on clinical issues.  *See* Dep. Tr. of E. Urban at 50 (Nurse Bechtold was appointed "to provide additional assistance to Dr. Stremple in areas where he had less expertise with the premise that both [she] and [the Plaintiff] would work in partnership to make . . . a smooth operation"); *see also id.* at 165 ("it was meant to be a partnership," because service line concept

---

[2]  *See* Dep. Tr. of E. Urban (Joint Ex. 1) at 30-31.  Dr. Urban passed away before this case went to trial.

required "more than one person could do").

As fact finder, the court has serious difficulties with the VA's decision to focus on administrative rather than clinical expertise in making the VP selection.  The decision came as a shock to persons both within the Pittsburgh VA and in the Central Office in Washington.  *See, e.g.*, Tr. at 90.46 (McDonald)[3] ("[O]ur objection [in the VA's] Central Office . . . was the fact that a non-surgeon was placed in [the Plaintiff's] stead.  A nurse was named as head of this program, and we were really astounded . . . because we knew that John had been there for years [and] had done an excellent job."); Tr. at 91.18 (O'Donnell) ("[T]he definition is 'surgical product.'  I mean, the 'product' is surgery, which I think . . . speaks for itself, in that the one to run that product line, since the product is surgery, should be a surgeon.").  Indeed Dr. McDonald testified that "[p]ractically all of the VA's who adopted [the service line] program did so naming the Chief of Surgery as the head of the product line, . . . -- that was the initial concept."  *See* Tr. at 90.45.[4]

Even more disturbing is the adverse effect the new focus on administration had on the quality of patient care.  *See, e.g.*, Tr. at 90.124-125 (Ferson) (discussing adverse consequences of new service line); Pl.'s Ex. 41 (email from Dr. Gayowski to other surgical section chiefs dated Jul. 20, 1998) ("I believe we all feel that patient care has been adversely affected," and

---

[3]  Gerald McDonald, M.D., is Senior Consultant of Surgery for the Department of Veteran's Affairs, Central Office.  He was able to provide an objective view regarding the events that transpired in Pittsburgh, having been higher up in the VA system and therefore insulated from local politics and personalities.  And though he did have a strong relationship with the Plaintiff, Dr. McDonald struck the court as being a particularly forthright and upstanding individual, thereby mitigating concerns of personal bias.

[4]  In light of Dr. McDonald's testimony, the parties' evidence regarding who became the VPs of the other Pittsburgh service lines seems far less relevant.

"unfortunately my patients have a tendency to die when this occurs"); *compare* Pl.'s Ex. 20

(Nurse Bechtold's memo in response to liver deaths, calling for creation of "task force") *with*

Pl.'s Ex. 23 (Dr. Gayowski's reply memo, noting that, in light of obvious connection between

fatalities and combination of patient wards, "[t]he request for the convening of a task force [wa]s

ridiculous"). And while the record is replete with finger-pointing, one obvious truth cannot be

ignored: as a consequence of the new organizational scheme, patient care suffered.[5]

Next, even assuming a partnership between the Plaintiff and Nurse Bechtold was

intended, the fact finder must question why the Pittsburgh VA would set up a competitive

employment process. The Defendant's documents, moreover, belie Dr. Urban's suggestion a true

partnership was intended. *See, e.g.*, Pl.'s Ex. 1 (Promotion Announcement) at 2 (VP was to

"have <u>full responsibility for the provision of surgical specialty care</u> at the [Pittsburgh VA]

including specialty <u>clinics</u>, <u>surgical consults</u>, the <u>operating room</u>, anesthesia and recovery";

incumbent was "required to provide guidance for <u>clinical programming</u>, [and] strategic and

business planning") (emphasis added); Pl.'s Ex. 28 (first quarter report, fiscal year 1998,

---

[5]  The court does not mean to suggest Nurse Bechtold was responsible for the liver patient deaths
in Pittsburgh. *See* Dep. Tr. of E. Urban at 187 (indicating that decision to place liver patients
with infectious patients was made by Dr. Urban, administrator Tom Cappello, and "the chief
nurse," not Nurse Bechtold). It was the administration's apparent insensitivity to the patients'
welfare, generally, that is troubling. *See, e.g., id.* at 57 (claiming that, despite numerous letters
regarding obvious infection risk, liver patient deaths "puzzled us for quite a while"); *id.* at 58-59
(acknowledging risk of commingling patients, but responding it was required as part of move
toward ambulatory care); *and id.* at 146-47 (dismissing questions regarding liver deaths with
statement, "people always die," and stating "[the] issue dealt with the downsizing of the
hospital"). Unfortunately, those most responsible have seemed least likely to acknowledge the
consequences of their actions. *Compare id. with* Tr. at 90.71 (McDonald) (in response to
suggestion that decision makers "didn't know they had a problem" until liver deaths occurred,
witness responded, "[i]f they didn't know, they were very stupid"). Having weighed the
evidence, moreover, the court finds credible the Plaintiff's testimony that he promptly objected
to the combination of wards but was powerless to change it. *See, e.g.*, Tr. at 93.32 (Stremple).

for surgical service line) (Nurse Bechtold was responsible for "[o]versight of all clinical and

administrative functions," Anita Steinmiller for "[c]linical management," and Dr. Stremple for

"[s]upervision of medical staff and resident[s]").  In any event, neither Dr. Urban nor the

Pittsburgh VA should have been surprised to experience a backlash from the non-selection of the

highly respected Dr. Stremple.  *See* discussions *supra* (noting unfavorable reaction of Plaintiff's

peers) and *infra* (finding testimony credible that Plaintiff exhibited dissatisfaction over non-

selection, but that said reaction was justified and did not cause constructive discharge).[6]

These things said, it is not for the court to determine whether the non-selection of

Dr. Stremple was motivated by age discrimination; nor can the employment decision form a basis

for relief.  *See* discussion *supra* at n.1.  Dr. Stremple's non-selection is, however, part of the

tapestry of events leading to his constructive discharge.

III.     **Conclusions of Law:  Constructive Discharge Vs. Hostile Work Environment**

Earlier in this case, the court implicitly recognized that the Plaintiff's hostile work

environment claims were timely under the continuing violations theory discussed in National

R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  *See generally* R&R (Doc. 30) at 13-17.

Having heard all the evidence, the court concludes Dr. Stremple cannot present a case of hostile

work environment.

There is a qualitative difference between the types of evidence that support a hostile work

environment claim and a traditional discrimination case.  *See* Schrader v. Tomlinson, 2005 WL

_____

[6]  To be clear, Nurse Bechtold also has provided years of valuable service to the VA as both a
nurse and a capable administrator.  *See, e.g.*, Tr. at 96.151-53 (Lowe) (Nurse Bechtold was
effective in resolving problems leading to substantial patient complaints).  She cannot be faulted
for believing herself qualified for the VP position, or for her ambition in applying for it.

327130, *3 (D.D.C. Feb. 9, 2005) ("hostile work environment claims are qualitatively different

from discrete acts of discrimination") (citation omitted); *see also* <u>Morgan</u>, 536 U.S. at 115

("[h]ostile environment claims are different in kind"); <u>Abramson v. William Paterson College of</u>

<u>New Jersey</u>, 260 F.3d 265, 281 n.11 (3d Cir. 2001) (district court erred by "conflating" claims of

discrimination and hostile work environment; "[t]he two claims have entirely different *prima*

*facie* cases and often courts may consider evidence for one claim and not the other").

Within the context of sex discrimination, for example, hostile work environment claims

typically involve:  the use of sexual, gender-biased, or gender-hostile language; the open viewing

of sexually explicit or pornographic materials; the writing of sexually charged notes or messages;

or lewd or lascivious behavior, including physical and/or sexual contact with the victim.  These

types of conduct, if sufficiently pervasive or regular, may be viewed as creating a work

environment sufficiently hostile to adversely affect a reasonable person.

The Third Circuit Court has not ruled out the possibility that ageist behavior similarly

may create a hostile work environment.  *Cf. generally* <u>Lyles v. Philadelphia Gas Works</u>, 2005

WL 2573319, *2 n.3 (3d Cir. Oct. 13, 2005) ("[w]e have not formally recognized a cause of

action for hostile work environment under the ADEA," but "assume, without deciding, that it

does").[7]  Dr. Stremple does not complain, however, of these types of behavior.

_____

[7]  Presumably, a compelling case of age-based hostile work environment would include things
like other employees shouting ageist remarks, placing wheelchairs, walkers, or adult diapers in
the plaintiff's workspace, drawing derogatory pictures of elderly people, *et cetera.*  The court
uses these examples not to be facetious, but to emphasize the distinction between the Plaintiff's
claims and those of persons suffering a hostile work environment based on more traditionally
charged protected classes, such as gender or race.

Rather, the evidence shows the Plaintiff endured a series of discrete events that were sufficiently intolerable to cause a reasonable person to resign. *See generally* Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996) (citing standards for constructive discharge). To the extent ageism is involved, then, it joins the evidence of retaliation to form a substantive basis for constructive discharge.

Unlike the discrete act of non-selection referenced above, the Plaintiff suffers no exhaustion problems regarding constructive discharge. In this context, the limitations period began to run when the Plaintiff gave notice of his retirement. *See* Gerhart v. Boyertown Area Sch. Dist., 2002 WL 31999365, *4 n.9 (E.D. Pa. Mar. 4, 2002) ("several . . . circuits have found that . . . an employee's constructive discharge claim accrues, for the purposes of calculating the statute of limitations period, [when] the employee gives definite notice of an intention to retire or resign") (citations omitted); *cf. also* Armington v. School Dist. of Philadelphia, 767 F. Supp. 661, 665 (E.D. Pa. 1991) ("the limitations period on [the] plaintiff's claim of constructive discharge . . . accrue[s when] the loss of employment occurred") (citing Third Circuit authority regarding different issue), *aff'd*, 941 F.2d 1200 (3d Cir. 1991). Dr. Stremple gave notice of his resignation after he filed a formal EEO charge, so the constructive discharge claim is timely. *See generally* Tr. at 94.167 & 94.129 (Stremple) (Plaintiff filed formal EEO complaint on Apr. 8, 1998, and retired Jul. 27, 1999).

The court's decision to view the Plaintiff's evidence of ageism through the prism of constructive discharge should come as little surprise to the parties. By direct Order of court, the constructive discharge theory has remained part of Dr. Stremple's case. *See* Mem. Opinion & Order (Doc. 53) at 4-8. And though at trial the court and the parties focused more on the hostile

work environment theory, the evidence introduced and resisted is equally relevant to the claims of constructive discharge based on age and retaliation. The Defendant has suffered no prejudice, and the court will proceed to analyze the Plaintiff's evidence under the constructive discharge standards.

IV.     **Findings of Fact:  The Plaintiff Was the Victim of Age Discrimination and Retaliation, Leading to His Constructive Discharge**

The fact finder determines, by a preponderance of the evidence, that Dr. Stremple was the subject of age discrimination and retaliation and that said conduct was a substantially motivating and/or determinative factor regarding the events leading to his constructive discharge. *See generally* Watson v. Southeastern Pa. Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000) (establishing jury standards for pretext and mixed-motives discrimination cases) (numerous citations omitted), *cert. denied*, 531 U.S. 1147 (2001).[8]  Among other things, the following evidence supports the fact finder's conclusions.

A.     **Evidence of Age Discrimination and Retaliation**

Upon her selection as VP, Nurse Bechtold possessed supervisory authority over the Plaintiff. *See* discussion *supra* (summarizing VP's job responsibilities); *see also* Tr. at 92.24 (Cappello) (upon Nurse Bechtold's appointment, Plaintiff "was now answering to [her as] a service line manager, what we call the vice-president").  The court finds credible the testimony of former secretary Janice Miller ("Ms. Miller"), who stated she heard Nurse Bechtold make ageist statements regarding the Plaintiff on more than one occasion. *See* Tr. at 93.8-9

---

[8]  The court need not determine whether the pretext or mixed-motives standards apply because the fact finder concludes both are satisfied.

("[she] w[as] talking about him being too old and need[ing] to retire") ; *id.* at 93.13-14

(confirming multiple instances of same).  And though Nurse Bechtold has disclaimed

involvement and/or decision-making authority regarding the constructive discharge events

described below, she was responsible for the service line under which Dr. Stremple acted as

Chief of Surgery.  If only by omission, she was complicit in creating a work environment

intolerable to a reasonable person in Dr. Stremple's position.

Next is Anita Steinmiller ("Ms. Steinmiller").  As seen above, the VA's quarterly report

placed her above Dr. Stremple in the administrative hierarchy; her responsibility for "[c]linical

management" (as opposed to the Plaintiff's "[s]upervision of medical staff") reveals the true

pecking order.  *See* discussion *supra* (citing and quoting Pl.'s Ex. 28); *see also, e.g.*, Pl.'s Ex. 37

(emails stating that, in Nurse Bechtold's absence, Ms. Steinmiller would be "Acting V.P." and

"[a]ny clinical issues should be directed to [her]"); Tr. at 90.106 (Starks) (Ms. Steinmiller did

perform Nurse Bechtold's functions when she was out of the office; she made decisions

regarding "surgical service, . . . physicians, [and] the operating room").

Two witnesses credibly testified that Ms. Steinmiller routinely made ageist comments

regarding the Plaintiff.  In addition to Ms. Miller, who heard Ms. Steinmiller discuss

Dr. Stremple's age with Nurse Bechtold,[9] secretary Lillie Gail Starks ("Ms. Starks") testified:

> [Ms. Steinmiller] asked me to carry Dr. Stremple his mail [to the
> first floor] because she did not want him on the third floor.  She
> did not want to see him.  She also said that she wished . . .
> he would retire because he's too old to be working here.  His hands
> were shaky. . . .  He didn't need to be in the operating room.

---

[9]  *See* Tr. at 93.8 (Miller) ("Miss Steinmiller had made comments . . . in reference to him needing
to retire, and that . . . he hadn't been in the operating room in so long he probably didn't know
what to do").

> He should let younger surgeons come in and do the job.  He didn't
> need to be there earning all that money.

Tr. at 90.110.  Ms. Steinmiller also had direct involvement in some of the events leading to

Dr. Stremple's constructive discharge.  *Compare id.* (after Plaintiff's office was moved from

third floor near operating room to first floor, Ms. Steinmiller made efforts to keep him away)

*and* Tr. at 93.6-8 (Miller) (although Ms. Steinmiller used to take notes at surgical service

meeting, "she sa[id] she was . . . going to [stop] attend[ing]" because "she just wanted to see

what [the Plaintiff] was going to do [about it]") *with* discussion *infra* (finding such incidents

relevant to constructive discharge).

     Last are the ageist comments of Assistant Chief of Staff David Eibling, M.D.

("Dr. Eibling") and other unidentified coworkers.  *See* Tr. at 90.139 (Ferson) ("several times"

Dr. Eibling "said . . . it's time to get Dr. Stremple out to pasture; . . . he's past his time.  We'll

have to find a way to move on."); Tr. at 91.21 (O'Donnell) ("some individuals thought he was,

quote/unquote, 'long in the tooth,' and that 'time had passed him by,' and it was time to get a

younger man in the position"; "[i]t was a group of us just sitting around talking about medical

things, and then the issue came up, and I can't recall who stated that, but I remember the term

'long in the tooth' very well").  Although some of the details are sketchy, these types of

comments provide circumstantial evidence of a culture of discrimination.  *See* Abrams v.

Lightolier Inc., 50 F.3d 1204, 1214 (3d Cir. 1995) ("discriminatory comments by

nondecisionmakers, or statements temporally remote from the decision at issue, may properly be

used to build a circumstantial case of discrimination") (citations omitted).  Ms. Steinmiller and

Nurse Bechtold, in addition to directly participating in the constructive discharge, likewise fueled

the culture of discrimination from a high level in the managerial chain.  *See* Ryder v.
Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997) (corporate culture evidence
strengthened where declarant is high in corporate hierarchy), *cert. denied*, 522 U.S. 1116 (1998).

In addition to age discrimination, the Plaintiff has shown by a preponderance of the
evidence that his constructive discharge was motivated by retaliation for his engaging in
protected activity.

Dr. Stremple filed an informal complaint with the EEOC shortly after his non-selection
for the VP position, in June 1997.  *See* Tr. at 92.146 (Stremple).  A few days later, the Plaintiff
met with Mr. Cappello, who advised him he would not win the EEOC complaint and urged
Dr. Stremple to continue along with the new service line "experiment."  *See id.* at 92.153-54;
*see also id.* (Mr. Cappello stated, "[i]f there's a quality-of-care problem, then we'll consider
changing it").[10]  On these representations, the Plaintiff decided not to press a formal complaint.
*See id.*  Shortly after being transferred to Aspinwall, however, the Plaintiff did file an official
complaint.  *See id.* at 93.70.

The fact finder concludes that Dr. Stremple's informal and formal EEO complaints
caused Mr. Cappello and Dr. Urban to act against him with retaliatory animus.[11]  The most
significant event leading to Dr. Stremple's constructive discharge, his transfer to Aspinwall, was
made at the hands of Dr. Urban less than seven months after the Plaintiff registered his informal

---

[10]  Dr. Stremple's testimony was credible in this regard.  If the court hereafter cites the Plaintiff's
allegations as fact, this means credibility determinations were made in his favor regarding
otherwise disputed issues.

[11]  The Plaintiff's informal EEO complaint qualifies as protected activity.  *See* Abramson, 260
F.3d at 287-88 (protected activity under ADEA extends to "informal protests of discriminatory
employment practices" far less conventional than contact with EEOC).

EEO complaint.  *Compare* Def.'s Ex. I (Dr. Urban's notes of July 18, 1997, referencing EEOC

activity) *with* Tr. at 95.85 (Stremple) & Pl.'s Ex. 5 (note to Dr. Starzl dated Feb. 9, 1998)

(confirming Dr. Urban decided on Plaintiff's transfer no later than February 1998); *see also* Dep.

Tr. of E. Urban at 74 (Dr. Urban made "strong recommendation" that Plaintiff be sent to

Aspinwall, and Mr. Cappello acquiesced).  Dr. Urban's deposition testimony confirms he viewed

the Plaintiff as a problem employee, and the court finds it more likely than not that the EEO

activity contributed to this portrayal.  *See generally, e.g.,* Dep. Tr. of E. Urban at 56, 61, 88

(Plaintiff was "disruptive" and "[un]cooperative," he "took . . . change very poorly," and he

"had little difficulty voicing his concern[s]") (emphasis added).[12]

Unlike Mr. Cappello, moreover, Dr. Urban gave no indication he was aware the Plaintiff

had withdrawn his informal EEO complaint.  *Cf.* Tr. at 92.36 (Cappello) (testifying Plaintiff

---

[12]  To be sure, the court finds credible the Defense witnesses' testimony that Dr. Stremple was
dissatisfied regarding his non-selection, and somewhat vocal regarding the same.  Dr. Urban's
assertion he was non-cooperative and difficult, however, is rejected as inconsistent with the other
evidence of record.  *See, e.g.*, Tr. at 93.11 (Miller) ("[The Plaintiff] got a long very well [with
others].  He was very personable.  He got along well with everyone."); Tr. at 90.139 (Ferson)
(testifying same); Tr. at 94.107-12 (Barilich) (although Plaintiff was unhappy with non-selection,
he was not disruptive or obstinate; in fact, he was so effective at Aspinwall, there was no need to
replace him when he retired).  The Defendant has not convinced the fact finder that Dr.
Stremple's poor treatment resulted from disgruntlement regarding his non-selection.  Likewise
unpersuasive were certain of the Defense witnesses' attacks on the Plaintiff's character and work
ethic.  *See, e.g.*, Tr. at 92.128-29 (Stremple) (highlighting inconsistency between Dr. Urban's
criticism that Plaintiff was not "visible" enough in Oakland, but then transferring him, despite
Chief of Surgery responsibilities, to Aspinwall); *compare* Tr. at 96.129 (Steinmiller) (claiming
Plaintiff "would arrive every day around 9:30, 10:00 [a.m.]") *with* Tr. at 96.14-15 (Bechtold)
(Dr. Stremple "attend[ed] many" surgical section chiefs meetings, scheduled at 6:45 or 7:00
a.m.).

had withdrawn his initial EEO complaint before having been transferred to Aspinwall).[13]

Rather, Dr. Urban claimed not to have known of any EEO activity until years later.  *See* Dep. Tr.

of E. Urban at 75.  This testimony is belied by his own handwritten notes, which reveal

knowledge of the June 1997 complaint in July of the same year.[14]  Finally, the fact finder is not

persuaded by the Defendant's reliance on the self-serving, and facially suspect, editorializations

in Dr. Urban's notes.  *See* Tr. at 94.136-37 (Schollaert, on cross-exam. of Plaintiff) (reading into

record portion of Dr. Urban's notes purportedly indicating Plaintiff's EEO charge was

"irrelevant").[15]

The court also accepts as credible the testimony that Mr. Cappello wanted to be rid of

Dr. Stremple.  *See, e.g.*, Tr. at 93.134-35 (Stremple) (before first bi-weekly meeting between

Plaintiff, Nurse Bechtold and Dr. Urban, as recommended by site visit inspectors, Mr. Cappello

told Dr. Stremple in confidence, "this is a waste of my time[,]  I don't know why I'm doing this,

---

[13]  The court is not convinced, as a matter of fact or law, that the Plaintiff's withdrawal of the first EEO complaint rendered him incapable of falling victim to retaliation regarding the same. As seen below, Mr. Cappello also saw the Plaintiff as a problem employee, and the mere fact Dr. Stremple withdrew his informal complaint did not cleanse the retaliatory taint.

[14]  In light of Dr. Urban's difficulty keeping his timeline straight, the fact finder will not attach great significance to the inconsistencies between the Plaintiff's deposition testimony and his clarifications at trial.  *See* Tr. at 95.39-42 (Stremple) (admitting on cross examination that, when he testified during deposition as to Dr. Webster's statements regarding EEOC, he mistakenly stated they occurred after first complaint was withdrawn but before second was filed).  In light of there having been two EEO complaints, and multiple meetings between Drs. Stremple and Webster, the Plaintiff's temporary confusion was understandable.

[15]  Dr. Urban closed his notes with the comment, "[C]hange is an emotional experience.  This [*i.e.*, the new product line and Dr. Stremple's non-selection,] is an excellent example."  *See id.* It is not within common experience for individuals to include such editorializations in their personal notes, and the fact finder must suspect the comments were intended for other eyes.

and I hope you have a good retirement package"); *id.* at 94.5-6 (Dr. Webster[16] called Plaintiff into meeting on February 10, 1998 and, in presence of Wife Carole Stremple, said "Mr. Cappello wants you out.  I don't know what you did to him, but he wants you out."); *see also* Tr. at  95.97-98 (Stremple, C.) (confirming same).[17]  The fact finder concludes Mr. Cappello's distaste for the Plaintiff was fueled by his irritation with the multiple EEO filings.  *See, e.g.*, Tr. at 92.153 (Stremple) (testifying Mr. Cappello discouraged him from proceeding with EEO complaint); *id.* at 94.9 (in meeting on June 5, 1998, Dr. Webster stated:  "Mr. Cappello wants you out now. He doesn't want you even at the University, Oakland, because he's . . . afraid you will give him trouble from the University. . . .  You must resign from the VA, and you must stop the EEO suit.").[18]

        For all of these reasons, the court finds by a preponderance of the evidence that the events leading to the Plaintiff's constructive discharge were motivated and caused by age discrimination and retaliation.  As seen below, these events were sufficiently intolerable that a reasonable person would have felt compelled to resign.

_____

[16]   Marshall Webster, M.D., was an official with the University of Pittsburgh School of Medicine, Department of Surgery.  In overruling a hearsay objection by the Defendant, the court found the Pittsburgh VA and the University of Pittsburgh (at times hereinafter, "Pitt") joint-venturers for the purposes of Dr. Stremple's employment.  *See generally* Tr. at 94.2-4 (court's evidentiary ruling); *see also generally* Tr. at 92.68 (Cappello) (describing relationship between VA and Pitt, for purposes of recruiting and employing physicians).

[17]   Although Mrs. Stremple obviously has a personal connection to this case, she like Dr. McDonald struck the court as being a particularly honest and compelling witness.

[18]   The court finds credible Dr. Stremple's testimony that Mr. Cappello did not like people going outside the system, whether regarding claims of discrimination or otherwise.  *See* discussion *supra* in text; *cf. also id.* at 93.143-44 (testifying Mr. Cappello got upset when Plaintiff reported clinical problems externally once internal efforts failed).

B.   **Constructive Discharge**

Having weighed all the evidence, and based on an assessment of the various witnesses'

credibility, the court makes these findings of fact regarding constructive discharge.

After Dr. Stremple was not selected for the VP position, a slow degradation of his

responsibilities, status, and authority began.  And though the Defense witnesses deny having

adopted policies to diminish the Plaintiff's role, a *de facto* evisceration of his position no doubt

was underway.  *Compare, e.g.,* Tr. at 96.16 (Bechtold) (denying having told workers to take OR

schedule to assistant chief of surgery Dr. Eibling) *and* Tr. at 88.19-20 (Eibling) (witness never

formally was assigned responsibility to approve OR schedule, "they brought it to me, [and] I just

did it") *with, e.g.,* Tr. at 90.124-25 (Ferson).  Dr. Ferson effectively summed it up:

> [T]he change came about through a gradual displacement of
> Dr. Stremple from his position as Chief of Surgery; taking away
> some of his responsibilities, moving him over to [Aspinwall] away
> from the University hospital where he couldn't function as a Chief
> of Surgery.  It . . . left a void where there didn't seem to be
> anybody for us to go to for guidance, for assistance, for problems
> that we needed to have solved.

*See* Tr. at 90.125.  Dr. Stremple explained his frustration with the situation:

> Although I ha[d] responsibility [for] providing [clinical] care, [the]
> service line vice-president ha[d] all the resources. . . .  [T]he
> responsibility was there, but not [my] ability to carry [it] out. . . .
> [I]t was very humiliating from the point of trying to get . . . things
> done.  And I had the impression that, . . . the entire time, . . .
> nobody wanted to hear me.  I was old and . . . had no authority
> anymore.  The OR said, you know, you're not my boss anymore.
> . . . [I]t was very difficult . . . to work within the service [line]
> without any authority or resources.

*See id.* at 92.120-21; *see also generally, e.g., id.* at  92.137, 93.18, 93.32, 93.38, 93.51, 95.84

-17-

(Plaintiff was removed from, not asked to join, and/or ignored at various meetings and committees); Tr. at 91.41 (O'Donnell) (at some point, it became unclear who was acting as Chief of Surgery, Plaintiff or Dr. Eibling; "[i]t was really very unclear," "his exact role was sort of nebulous").

As Dr. Stremple became more and more marginalized, he began to suffer indignities recognized in the Third Circuit as the substance of constructive discharge.  *See generally* Suders v. Easton, 325 F.3d 432 (3d Cir. 2003) (summarizing constructive discharge standards), *vacated in part on other grounds in* Pennsylvania State Police v. Suders, 542 U.S. 129 (2004).

On February 10, 1998, Dr. Webster called the first of three meetings with the Plaintiff, encouraging him to retire.  *See generally* Tr. at 94.5-8 (Stremple); Tr. at 95. 97-100 (Stremple, C.). The Stremples testified, and the court believes, that Mr. Cappello was behind the effort.  *See* discussion *supra*; *see also* Suders, 325 F.3d at 445 (*Clowes* factors, indicative of constructive discharge, include "suggestions or encouragement of resignation") (citations omitted).

Then came the transfer to Aspinwall.  *See* discussion immediately *infra*; *see also* Suders, 325 F.3d at 445 (*Clowes* factors also include "involuntary transfer to a less desirable position" and "alteration of job responsibilities").  The effects of this employment decision on the Plaintiff were devastating, as explained by Dr. Stremple's peers:

> *Dr. Starzl*:    [In being transferred to Aspinwall,] John had been fired [as Chief of Surgery]. . . .  If I got the memorandum [advising of the decision], I would say I was fired.  That's pretty clear. . . .  John was a distinguished man, had a distinguished war record and rendered distinguished services to the . . . VA system. . . .  [I]t was undignified to do anything other than walk away . . . .

As an assignment to Aspinwall was an assignment to the pits . . . . I never went to Aspinwall myself[, t]hat was how far it was outside the University orbit. . . . If it happened, [the transfer] would be a direct message that you've been removed from the University [medical system], in which I had spent my whole career. So had John. . . . [I]t was a position that had the implications that I've described. . . . [T]hat was closing the curtain. That's the end of the play.[19]

Dr. McDonald:    I was very upset [regarding the transfer], . . . -- to say the least. . . . Dr. Stremple [was one of the] . . . . the best surgeons in the VA system . . ., and we worked closely together. He had set up the liver transplant program, and I felt that someone was really out of their mind to do this. It was a complete affront to not only him, but to [the] Central Office and to patient care.[20]

Dr. Ferson:    It was very discouraging, disappointing. Almost like a betrayal. I think he had probably been the best Chief of Surgery that I had worked with . . . . He certainly was the most capable in terms of administration, and it left with us a terrible void and [we] kind of felt like orphans.

I was aware of the charade of it [later] being [deemed] a part-time [assignment]. . . . There's certain times people make a decision to, so-call, promote somebody to a position, where everybody knows it's a demotion. It's a . . . mystical thing that happens. And assigning him over to Aspinwall, no matter whether it was part-time, full-time, or even a minute [of] time, essentially takes him away from the University Drive facility.[21]

---

[19]  Tr. at 90.13, 90.25.

[20]  Tr. at 90.52.

[21]  Tr. at 90.137, 90.150-51.

-19-

Upon being transferred to Aspinwall, Dr. Stremple became seriously concerned regarding

his ability to perform Chief of Surgery responsibilities:

> [As] Chief of Surgery, you're absolutely responsible for all 3,000
> or so operations that are done per year, and all review of the
> residents, all review of the intensive care unit, the surgical wards,
> the safety of the patients in the operating room. . . .  I was shocked
> [and] scared for dereliction of duty reasons. . . .
>
> I couldn't be both two places at one time.  And I was very, very
> concerned about that.  I was worried about dereliction of duty.
> And in some cases you can be put up for manslaughter . . . if
> something bad in surgery happens.  This happened in North
> Chicago.

*See* Tr. 93.68-70, 92.129-30.  The Plaintiff's concerns were well founded, given the testimony of

his colleagues:

*Dr. Starzl*:    Aspinwall was so far remo[ved] from any function that
took place [in Oakland], or that had anything to do with the
education of medical students, residences, house officers, it
was as if it didn't exist. . . .  I don't see how somebody
could carry out the functions . . . entrusted to the Chief of
Surgery at the Oakland VA, . . . -- how those functions
could be carried out from Aspinwall.[22]

*Dr. McDonald*:    [It] was impossible for [Dr. Stremple] . . . to assist in
consultations . . . in the operating room at Oakland[;] to
supervise the residents and the attendants . . . [; or] to do
credentialing and privileging of . . . the surgeons.[23]

---

[22]  Tr. at 90.29.

[23]  Tr. at 90.54.

*Dr. Ferson*:        [H]e had been moved over to another Hospital, so we couldn't . . . deal with him.  He wasn't around to look at patients and make rounds . . . .  He wasn't there to intervene when there was an urgent problem in the operating room and we needed somebody to make a decision.  [After the transfer,] I was concerned about . . . the safety of the patients.  I was concerned about the efficiency of the operating rooms, the efficiency of my clinics.[24]

*Dr. O'Donnell*:  He was clearly not available to residents, and he was clearly not available to the patients or the nurses in the operating room. . . .  [P]rior to that, even the nurses could walk in and simply -- John had time.  The operating nurses could talk to him about a problem in the operating room, and they often did . . . .  But once he moved to Aspinwall, his availability was severely limited. . . .  [H]e might as well have [been] in Cleveland.[25]

In sum, the transfer to Aspinwall dealt a devastating blow regarding the terms and conditions of Dr. Stremple's employment.  Whether full time or part time, the Plaintiff could not fulfill his responsibilities as Chief of Surgery remotely from Aspinwall.[26]

---

[24]  Tr. at 90.125, 90.136.

[25]  Tr. at 91.27-28, 90.21-22.

[26]  The court finds Aspinwall site manager John Barilich was sincere in his belief that the facility needed a surgical presence.  *See* Tr. at 94.101-102 (credibly testifying it was his decision to seek surgical presence based on perception of need).  It was the administration's decision to send the Chief of Surgery that is suspect.  In opining that the job could be done remotely, the VA administrators were either being obtuse or, as Dr. McDonald said, "very stupid."  *Compare* Tr. at 92.39 (Cappello) ("I didn't see a big issue" with transfer) *and* Dep. Tr. of E. Urban at 82-83 (suggesting "modern communications" such as phones, e-mail, pagers and cars, would allow Plaintiff to fulfill his duties from Aspinwall) *with* discussion *supra* (summarizing testimony of four doctors indicating Chief of Surgery position could not be performed remotely) *and* Tr. at 93.82 (Stremple) ("[I]t sounds like administratively you could do that.  But I'm the Chief of Surgery.  We're talking about patients who bleed in seconds.").  The court finds it more likely than not that Dr. Stremple was sent to Aspinwall in an effort to get a problem employee out of the way, and Nurse Bechtold's failure to object likewise suggests poor judgment, discriminatory

-21-

The Aspinwall transfer was not only intolerable to a reasonable person in the Doctor's shoes, but downright dangerous, and it alone was sufficient to cause his constructive discharge.  *See* <u>Suders</u>, 325 F.3d at 444 (constructive discharge standards look to "a reasonable person in the employee's shoes"); <u>Duffy v. Paper Magic Group, Inc.</u>, 265 F.3d 163, 169 n.2 (3d Cir. 2001) ("a single, non-trivial incident of discrimination may be egregious enough to compel a reasonable person to resign") (citation omitted).[27]

Shortly after the transfer, the Plaintiff received a job performance evaluation that ranked him "low satisfactory" for administrative competence and "satisfactory" overall.  *See* Pl.'s Ex. 4. These marks were substantially lower than he had received in many years previous, *compare id. with* Pl.'s Ex. 12 (collecting prior performance reviews), and Dr. Urban's narrative report was quite critical.  *See id.*; *see also* <u>Suders</u>, 325 F.3d at 445 (*Clowes* factors include "unsatisfactory job evaluations").

---

bias, or both.  *See* Tr. at 89.59 (Nurse Bechtold "had no problem with sending the Chief of Surgery to Aspinwall . . . because it was [her] expectation that [he] was responsible for all surgery at all three sites," despite fact that actual surgeries were performed only in Oakland) *and id.* at 96.52 (stating she never objected or "ha[d] any discussion with Dr. Urban about the fact that he was making decisions affecting [her] Chief of Surgery"); *see also* discussion *supra* (finding by preponderance of evidence that Nurse Bechtold made discriminatory comments, she was responsible for service line under which Dr. Stremple served, and by her omissions was complicit in constructive discharge).

[27]   The fact that Dr. Stremple continued working after the transfer is no impediment to his claim. *See* <u>Aman</u>, 85 F.3d at 1084-85 (Third Circuit Court does not impose an "aggravated circumstances" requirement for constructive discharge; "[a] jury could conclude that the conditions of [the Plaintiff's] employment were intolerable, and that while [he] had the fortitude to stay [for some time, his] strength finally failed") (citations omitted).  To be clear, the court expressly finds the Aspinwall transfer sufficiently egregious to constitute a constructive discharge.  It also relies on the other evidence of constructive discharge, however, discussed above and below.

Then, in April 1998, Dr. Stremple's office was moved from the third floor near the OR to the first floor. *See* Tr. at 93.100 (Stremple); *see also generally* discussion *supra* (discussing Ms. Steinmiller's efforts to keep Plaintiff off third floor). Meanwhile Dr. Eibling, who continued to assume more of the Plaintiff's responsibilities, was relocated to an office closer to the OR. *See* Tr. at 93.101-102 (Stremple). Although the Defendant has introduced evidence that the order and placement of office relocations was coincidental, the fact finder questions why an exception would not be made for the Chief of Surgery.[28]

Thereafter, Dr. Webster called two additional meetings to discuss the Plaintiff's retirement; Mr. Cappello was behind at least one of them. *See* Tr. at 94.8, 94.18 (Stemple).

Finally, in February 1999, Mr. Cappello made clear that Dr. Stremple no longer was welcome at the Pittsburgh VA. *See* discussion *supra* ("this [meeting] is a waste of my time[,] I don't know why I'm doing this, . . . I hope you have a good retirement package"); *see also* Suders, 325 F.3d at 445 (*Clowes* factors include "threat of discharge").

---

[28] When asked why the Plaintiff, rather than Dr. Eibling, was relocated to the first floor, Nurse Bechtold responded, "[j]ust because of the evolution of the moves. That's how it ended up at the time." *See* Tr. at 96.46. She also disclaimed decision making authority. *See id.* Again, this begs the question why she, as VP of the line, would not intervene on behalf of her Chief of Surgery. *See* discussions *supra*.

In addition, the court has considered the evidence that the Chief of Critical Care was moved from the third floor, where the CCU was located, to the first floor. *See* Tr. at 96.146-47 (Lowe). There is no evidence, however, that efforts were made to keep that physician off the third floor following his relocation. *See* discussions *supra*.

Based on the foregoing, the Plaintiff finally had enough:

> I decided to retire when . . . [Mr. Cappello] said to me privately,
> . . . why am I wasting my time talking to you?  It's pretty obvious
> at that time . . . he never wanted to discuss it ever again, and . . .
> I was just ignored and completely useless at [the] job. . . .  I'm
> [not] the type of person . . . [who can] sit and read a magazine in
> Aspinwall and collect a check.  That's not me. . . . I had no
> alternative [but to leave].

*See* Tr. at 94.23-24.

The Plaintiff has presented a textbook case of constructive discharge.  He lost his

employment as a result of discrimination and retaliation, and he is entitled to damages.

## V.   <u>Damages</u>

In his proposed findings and conclusions, the Plaintiff requests back pay from the time of

his retirement until the age seventy, when he otherwise had planned to retire.  *See generally* Pl.'s

Proposed Findings & Conclusions (Doc. 98) at 49-50.

The court finds credible the Stremples' testimony that the Plaintiff planned to continue

working until he reached the age seventy.  *See* Tr. at 93.161 (Stremple) *and* Tr. at 95.99-100

(Stremple, C.).  The court also finds that Dr. Stremple made reasonable efforts to mitigate

damages, given (a) the highly specialized and unique nature of the Plaintiff's former position,

(b) his unsuccessful applications for chief of surgery positions at the two major, non-University

affiliated hospitals in the Pittsburgh area,[29] and (c) his credible testimony regarding the

prohibitive cost of malpractice insurance given his financial position.  *See generally*

Tr. at 93.169, 94.28-29 (Stremple); Tr. at 95.106-107 (Stremple, C.).

---

[29]  The Plaintiff's settlement with Pitt forbade him from working at a University-affiliated
hospital.  *See id.* at 93.168-69; *see also* discussion *infra* regarding buyout agreement.

Having observed Dr. Stremple's physical demeanor and mental acuity at trial, the court has every confidence he could have continued the Chief of Surgery position at the Pittsburgh VA until his seventieth birthday.  Thus, the court will award him his yearly VA salary at the time of his retirement, established at trial to be $163,205.00 (*see* Tr. at 88.70), for six and one quarter (6.25) years.[30]  Thus, the Plaintiff is entitled to judgment in the amount of one million, twenty thousand, thirty-one dollars and twenty five cents ($1,020,031.25).[31]

The Plaintiff has offered no evidence to establish how his salary would have changed over the years.  Nor has his counsel requested pre- or post judgment interest, or liquidated damages for alleged willful violation(s) of the ADEA.  Accordingly, and through an exercise of the court's discretion, the Plaintiff's recovery will be restricted to the figure cited above.

Dr. Stremple also has asked to be awarded his salary from the various University of Pittsburgh entities through which he was employed.  *See* Pl.'s Findings & Conclusions at 49 (seeking $72,587.00 annually for salaries paid by University of Pittsburgh, UPMC and University Surgical Associates).  The Plaintiff already has received compensation for giving up his University positions, however,[32] so the fact finder will decline his request in this regard.

---

[30]  The Plaintiff retired at the end of July 1999, and his seventieth birthday was October 26, 2005.  *See* discussion *supra* and Tr. 91.42 (Stremple) (Plaintiff's date of birth was Oct. 26, 1935).  The time between was approximately six years and three months, or 6.25 years.

[31]  Although the Plaintiff has received social security benefits and a federal pension, the Defendant has neither requested nor shown that any setoff(s) are appropriate.  *See* Tr. at 96.6 (Schollaert) ("I do not plan to make any argument regarding pension receipts future or prior, or anything of that nature").

[32]  The Plaintiff entered a buyout agreement with Pitt, under which he received $250,000.00 in 1999.  *See* Tr. at 95.46-47 (Stremple).

**VI.**     <u>**Conclusion**</u>

For all the reasons stated above, judgment will be entered in favor of the Plaintiff and

against the Defendant in the amount of $1,020,031.25.

THESE FINDINGS AND CONCLUSIONS ARE SO ENTERED.


June 22, 2006

Francis X. Caiazza
U.S. Magistrate Judge


cc (via email):

Verdell Dean, Esq.
James P. Ross, Esq.
Albert W. Schollaert, Esq.